UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

GORDON A. BRYANT,
   Plaintiff,

vs.                                        No. 07-3032

DOCTOR JOSEPH MAUER, et. al.,
   Defendants

## SUMMARY JUDGEMENT ORDER

This cause is before the court for consideration of the defendants' renewed motion for summary judgment. [d/e 34]

## I. BACKGROUND

The pro se plaintiff filed his lawsuit pursuant to 42 U.S.C.§1983 against Defendants Sangamon County Jail Dr. Joseph Maurer, Nurse Kendra Fabish and Sangamon County Sheriff Neil Williamson. On March 30, 2007, the court conducted a merit review of the plaintiff's complaint and concluded that the plaintiff had stated "a claim for deliberate indifference to his serious medical needs under the Eighth Amendment (or the 14th Amendment, if he was pretrial detainee at the time)." March 20, 2007 Text Order.

Specifically, the plaintiff alleges that he was not provided the proper treatment for the disease of myasthenia gravis during his time at the Sangamon County Jail.

The defendants first filed their motion for summary judgement on February 29, 2008. However, the defendants also asked for additional discovery concerning the plaintiff's medical records. The motion was granted, and the dispositive motion was denied with leave to renew. *See* April 9, 2008 Text Order, September 11, 2008 Text Order. The court also granted the defendants motion to renew their summary judgment motion and allowed the plaintiff extra time to file a response. July 10, 2009 Court Order.

The court notes that although the plaintiff was clearly advised that he must provide a response to the renewed motion for summary judgment which provided "specific facts showing a genuine issue for trial," the plaintiff's response contains very little information. *see also* July 13, 2009 Court Order, *see also* Fed. R. Civ. P. 56(e), *see also* [d/e 35]. Instead, the plaintiff has made general claims that the medical records show his lack of treatment. [d/e 66] The plaintiff also claims a U.S. Marshal will support his claims at trial, but has provided no evidence of this in response to the pending dispositive motion. Nonetheless, the court recognizes that the plaintiff is proceeding pro se, and believes the plaintiff may have been confused since this was a

"renewed" motion for summary judgement. Therefore, the court has also reviewed the numerous responses and documents the plaintiff has previously filed in the course of this litigation. [d/e 21, 36, 46, 47, 59, 62, 63]

## II. FACTS

The plaintiff did not directly respond to the defendants statement of undisputed facts. Therefore, the following facts are taken from the exhibits presented by both parties.

Myasthenia gravis is a "chronic autoimmune neuromuscular disease characterized by varying degrees of weakness of the skeletal (voluntary) muscles of the body....Certain muscles such as those that control eye and eyelid movement, facial expression, chewing, talking and swallowing are often, but not always, involved in the disorder." (Def. Memo, Dr. Maurer Aff, Ex A, National Institute of Neurological Disorders, p 3)

The first noticeable symptoms are often weakness of the eye muscles or difficulty in swallowing or slurred speech. The degree can vary widely between patients. (Def. Memo, Dr. Maurer Aff, Ex A, National Institute of Neurological Disorders, p 4). "Unfortunately, a delay in diagnosis of one or two years is not unusual..." (Def. Memo, Dr. Maurer Aff, Ex A, National Institute of Neurological Disorders, p 5).

The plaintiff entered the Sangamon County Jail on June 29, 2004 and was transferred to a new facility on December 22, 2004. The plaintiff was 70 years old at the time he entered the jail. During his six month stay, the plaintiff was seen by medical staff a minimum of 32 times. (Def. Memo, Braurer Aff, Ex. B).

The plaintiff immediately made requests for an eye exam due to "impaired vision." (Def. Memo, Braurer Aff, Ex. B). The plaintiff was seen by a doctor who conducted a complete exam and ordered lab work.

On July 8, 2004, the plaintiff fell in his cell. Medical staff examined the plaintiff who denied being in any pain and was able to move his extremities. Nonetheless, the plaintiff was moved to a booking cell where frequent checks could be made. The plaintiff was monitored and since his vital signs were normal, he was allowed to return to his cell the next day. (Def. Memo, Maurer Aff, Ex. B, med. record).

The plaintiff received a physical, a chest X-ray and a second eye examination in July of 2004. In August, the plaintiff continued to complain of poor vision and said he was having mobility problems with left arm. The plaintiff was examined on five separate occasions in July and an appointment with an outside eye specialist was scheduled.

On August 27, 2004, the plaintiff complained of chest pain and nausea. He was moved to the medical department. The plaintiff was examined, placed on antibiotics and returned to his cell three days later.

2

On September 1, 2004, the plaintiff received an outside eye examination, and an opthomology appointment was recommended. The appointment was made for cataract consultation and possible surgery, but it was later canceled when the United States Marshals Office informed the plaintiff that they did not pay for this type of procedure. The plaintiff was told he could have family pay for the bill if he wished. (Def. Memo, Maurer Aff, Ex. B).

The plaintiff continued to be seen and treated in the medical department in September for complaints concerning a sore leg, continued mobility problems with his arm, sinus problem, a strained groin area, pain in his right side and stress. (Def. Memo, Maurer Aff, Ex. B).

In October, the plaintiff was seen and treated in the medical department on seven occasions. Most of the time, the plaintiff was complaining that he was not receiving the sinus medication that he wanted. However, on October 30 and October 31, 2004, the plaintiff complained of chest pains and numbness in his arms and hands. The plaintiff's vital signs remained normal. (Def. Memo, Maurer Aff, Ex. B).

On November 1, 2004, Dr. Maurer examined the plaintiff concerning his complaints of a continued headache, on and off chest pain, and numbness and weakness in his hands. The doctor noted that the plaintiff was able to use his arms and hands normally to steady himself on the scale and was able to remove his shirt and t-shirt without assistance. The doctor noted, "suspect malingering, same Rx." (Def. Memo, Maurer Aff, Ex. B).

The plaintiff notes that individuals who suffer from myasthenia gravis may see improvement in muscle use after a period of rest. The plaintiff says each time he was examined by a doctor, it was after a period of rest. [d/e 62, p 1-2]

On November 15 and 17, 2004, the plaintiff again complained of problems with numbness in his arms, back aches, problems swallowing and some chest pain. Again, the plaintiff was able to remove shirt without assistance. The plaintiff was examined, but no irregularities were noted. The plaintiff was continued on his previously prescribed medication. (Def. Memo, Maurer Aff, Ex. B).

On December 5, 2004, the plaintiff complained that he could not stand or walk due to a tingling and numbness in his legs. The plaintiff reported for a doctor's examination on December 6, 2004 and was able to walk without assistance or any noted abnormalities. The doctor examined him and noted that the plaintiff was "[e]ncouraged to make more responsible complaints." (Def. Memo, Maurer Aff, Ex. B, p. 3). The plaintiff was returned to his cell, but complained to staff of heaviness in his arms and legs later in the day. The doctor instructed staff to monitor the plaintiff and the doctor later examined the plaintiff. At this point, the plaintiff said his condition had improved somewhat.

On December 7, 2004, the plaintiff was again brought to the medical department complaining of a stiff neck, sharp upper back pain and dizziness. The U.S. Marshals were

notified of the plaintiff's frequent medical complaints. The plaintiff was examined and the doctor noted that the plaintiff's gait was somewhat staggered. The plaintiff denied having any chest pain, but did have shortness of breath. Dr. Maurer ordered that the plaintiff be sent to the local hospital. (Def. Memo, Maurer Aff, Ex. B).

The record from St. John's Hospital note that the plaintiff was placed on a cardiac monitor and received a chest X-ray, but no problems were noted. The report ends with "FINAL IMPRESSION Weakness." (Def. Memo, Maurer Aff, Ex. B, p. 3, med. records). The plaintiff was discharged.

The next day, the plaintiff was again seen by Dr. Maurer. The plaintiff had also received CT scan of his brain which showed no hemorrhage or mass. The doctor noted the plaintiff was able to walk and stand on the scale unassisted as well as remove his shirt and T-shirt.

Later in the day, the doctor was called to the plaintiff's cell after the plaintiff had collapsed. The plaintiff said his legs gave out and he hit his head. Officers confirmed that the plaintiff had not lost consciousness. The plaintiff was alert and oriented, but had a small bruise on his head. The plaintiff was transferred to the medical unit. The doctor advised the United States Marshal's of the plaintiff's condition and an appointment was made as soon as possible with a neurologist. The appointment was scheduled for December 22, 2204. The plaintiff was transferred out of the Sangamon County Jail on this date and was unable to keep the appointment.

The plaintiff was taken to the Federal Medical Center at Devens, Massachusetts. The plaintiff was examined by a doctor who then referred him to a neurologist. The neurologist suspected the plaintiff might have myasthenia gravis and admitted the plaintiff to the hospital. (Def. Memo, Plain. Depo, p. 26-27, 34) Tests confirmed the plaintiff suffered from myasthenia gravis in late January of 2005. [d/e 21, p. 1]

Dr. Maurer states that the plaintiff:

> demonstrated variable symptomatology throughout the latter months of his confinement in the Sangamon County Jail. Many complaints were subjective and nebulous. These types of complaints can lead one to suspect malingering. (Def. Memo, Dr. Maurer Aff, p. 1).

Nonetheless, Dr. Maurer was the doctor that ordered that the plaintiff be taken to an outside hospital and also arranged an appointment with a neurologist.

> I ordered that the appointment be made for the purpose of ruling out myasthenia gravis. I had not diagnosed that the plaintiff suffered from that condition, but at that point I had a suspicion that he may have it. Only a neurologist is qualified by training and experience and specialized testing to diagnose this condition. (Def. Memo, Dr. Maurer Aff, p. 2).

4

The plaintiff disputes this claim and says the order to take the plaintiff to a neurologist came from the U.S. Marshals. The plaintiff claims Dr. Maurer told him on December 8, 2004, that he would not be seeing a neurologist. (Plain. Resp., d/e 36, p. 3). The plaintiff alleges that Dr. Maurer never suspected that he suffered from myasthenia gravis and never approved a visit with a neurologist prior to the actions taken by the United States Marshals. (Plain Resp., d/e 36, p 11-12, Plain Aff.).

The plaintiff has provided a copy of an order in the case *United States v Bryant,* 04 cm 30045, dated December 15, 2004. The plaintiff indicated to United States District Court Judge Jeanne Scott that he wished to enter a guilty plea.

> The Court inquired of the Defendant and determined that he suffers from several serious medical conditions. He has: (1) a heart condition for which he takes six different medications, (2) serious problems with his eye sight including cataracts and drooping eyelids, (3) persistent pain in the back of his head, (4) numbness in both arms and one leg, and (5) loss of the use of at least some of his fingers. The Court is concerned that one or more of these symptoms indicate that he may suffer from conditions that may impair his ability to enter a knowing and voluntary plea. The Court is further concerned that the Defendant's medical conditions are serious enough that he needs to be sent immediately to the Bureau of Prisons for evaluation and treatment. *United States v Bryant,* 04 cm 30045, December 15, 2004 Court Order, p. 1-2.

Notes from the U.S. Marshal's Service indicates the action was ordered due to the severity of the plaintiff's complaints and his age. [d/e 59, p. 1, 21]

Dr. Maurer says Kendra Fabish was the Nursing Director at Sangamon County Jail and did not have the authority to diagnose or order treatment for an inmate. The plaintiff says Nurse Fabish did make decisions as to whether he should be placed in a medical cell or in a booking cell for observation.

Neil Williamson says he is the Sheriff of Sangamon County and has no medical training. Instead, Williamson says he has contracted for medical services for inmates at the jail. Williamson says he relies on these individuals to provide medical care and had no personal involvement in the plaintiff's medical care. (Def. Memo, Williamson Aff, p. 1-2)

5

III. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

IV. ANALYSIS

Defendant Dr. Maurer argues that the plaintiff cannot demonstrate that he was deliberately indifferent to a serious medical condition. Pretrial detainees such as the plaintiff have a right to adequate medical care under the Fourteenth Amendment, but the court evaluates those claims using the same standards it uses to assess an Eighth Amendment claim. *Williams v Rodriguez,* 509 F.3d 392, 401 (7th Cir. 2007). Therefore, to succeed on his claim, the plaintiff must show: 1) that the harm he suffered was objectively serious, and 2) that officials acted with deliberate indifference to his health and safety. *Id.*

In this case, the plaintiff clearly suffered from a serious medical condition, so the court must focus on the second prong of the test. "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42). Negligence, even

gross negligence, does not constitute deliberate indifference. *Guzman v Sheahan,* 495 F.3d 852, 857 (7th Cir. 2007). In addition, "medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." *Gutierrez v. Peters,* 111 F.3d 1364, 1374 (7th Cir. 1997).

Based on the record before the court, the plaintiff cannot demonstrate that Dr. Maurer was deliberately indifferent to his serious medical condition. First, the plaintiff clearly did receive on-going medical care including physical examinations, eye exams, lab work, an E.K.G., a cardiac profile, chest X-rays, and a C.T. scan of his brain. The plaintiff was sent to an outside hospital for evaluation, but not to a neurologist. The plaintiff would have a difficult time demonstrating this care was "so blatantly inappropriate" that it demonstrates intentional mistreatment. *Snipes v DeTella,* 95 F.3d 586, 592 (7th Cir. 1996). The defendants have provided a fact sheet from the National Institute of Neurological Disorders and Stroke which states that the symptoms of myasthenia gravis "often are not immediately recognized" and "a delay in diagnosis of one or two years in not unusual..."(Def. Mot, Ex A, Fact Sheet, p.2).

Second, the plaintiff himself admits that "it is doubtful that Dr. Maurer suspected myasthenia gravis." (Plain. Resp., d/e 36, p. 2) Therefore, the plaintiff could not demonstrate that the doctor was aware of the risk and consciously disregarded it.

The plaintiff has also failed to demonstrate that Nurse Kendra Fabish was deliberately indifferent to his serious medical condition. Nurse Fabish did not have the authority to diagnose or order treatment for any inmate. The plaintiff's main complaint is that this defendant placed him in "a high risk medical watch cell in booking with a loud mouth teenager and later two drunks" showing a lack of concern for his medical condition. (Plain. Resp, d/e 36, p. 4). The plaintiff also alleges that the cell was dirty and he had to sleep on the floor. The plaintiff has failed to show that this one incident rises to the level of an Eighth Amendment violation. He was placed in the cell so that he could be routinely monitored. Any claims concerning the condition of that cell are not before this court.

The plaintiff has also failed to demonstrate that Sangamon County Sheriff Neil Williamson was deliberately indifferent to his serious medical condition. To survive summary judgment, the plaintiff must offer some record evidence that the defendant "knew of a constitutional deprivation and approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated." *Vance v Peters,* 97 F.3d 987, 994 (7th Cir. 1996) *quoting Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir. 1995). *See also Jones v Drew,* 2007 WL 737359 at 3 (7th Cir Mar. 12, 2007)(Warden delegated medical and grievance functions to subordinates, no liability when defendant is not personally responsible for the deprivation). In addition, "non-medical officials are entitled to defer to the professional judgement of the facility's medical officials on questions of prisoners' medical care..." *Hayes v Snyder,* 546 F.3d 516,527 (7th Cir. 2008); *see also Spruill v. Gill,* 372 F.3d 218, 236 (3rd Cir. 2004)("a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). The motion for summary judgement is therefore granted.

**ITS IS THEREFORE ORDERED that:**

**1) The defendants' renewed motion for summary judgement is granted pursuant to Fed. R. Civ. P. 56. [d/e 34] The clerk of the court is directed to enter judgment in favor of the defendants in accordance with this order. The parties are to bear their own costs. This case is terminated.**

**2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)c. If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**

**3) The agency having custody of the plaintiff is directed to remit the docketing fee of $350.00 from the plaintiff's prison trust fund account if such funds are available. If the plaintiff does not have $350.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $350.00 is paid in its entirety. The filing fee collected shall not exceed the statutory filing fee of $350.00.**

**4) The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such a change. Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.**

**5) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this 5th day of February, 2010.

                                        s\Harold A. Baker
                         _____
                                    HAROLD A. BAKER
                              UNITED STATES DISTRICT JUDGE